**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

**AUG 2 0 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **The Estate of JOHN PATRICK O'NEILL, SR., on behalf of JOHN PATRICK O'NEILL, SR., deceased, and on behalf of decedent's heirs-at-law** | ) ) ) ) ) |
| **JOHN PATRICK O'NEILL, JR.** P.O. Box 153 Abingdon, MD 21009 | ) ) ) ) |
| **CHRISTINE IRENE O'NEILL** P.O. Box 155 Ocean City, NJ 08226 | ) ) ) ) |
| **CAROL O'NEILL** P.O. Box 155 Ocean City, NJ 08226 | ) ) ) ) |
| **DOROTHY A. O'NEILL** P.O. Box 155 Ocean City, NJ 08226 | ) ) ) ) |
| Plaintiffs, v. | ) ) ) ) ) |
| **THE REPUBLIC OF IRAQ** Iraqi Intelligence AGENCY a/k/a/ The Mukhabarat a/k/a/ The Fedayeen a/k/a/ Al-'Qare a/k/a/ "Unit 999" a/k/a/ "M-8 Special Operations" | ) ) ) ) ) ) |
| Algerian Embassy Iraqi Interests Section c/o Embassy of The People's Democratic Republic of Algeria 2137 Wyoming Ave, N.W Washington, D.C. 20008 | ) ) ) ) ) ) ) |
| **SADDAM HUSSEIN** | ) ) |
| **HUSHAM HUSSEIN** | ) ) |

CASE NUMBER   1:03CV01766

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 08/20/2003

**JURY ACTION**

**Jury Trial Demanded**

THE ESTATE OF QUSAY HUSSEIN    )

THE ESTATE OF UDAY HUSSEIN    )

ABDEL HUSSEIN A/K/A/ "THE
GHOST"    )

AHMED KAHLIL IBRAHIM SAMIR
AL-ANI    )

FARUQ AL-HIJAZI    )

HABIB FARIS ABDULLAH AL-
MAMOURI    )

TAHA YASSIN RAMADAN    )

MUHHAMED MAHDI SALAH    )

SALAH SULEIMAN    )

HAQI ISMAIL    )

TAHA AL ALWANI    )

ABU AGAB    )

ABU WAIEL    )

ABU SAYYAF    )

HAMSIRAJI SALI    )

AL QAEDA ISLAMIC AGENCY    )

OSAMA BIN LADEN    )

ABU MUSAB ZARQAWI    )

EGYPTIAN ISLAMIC JIHAD    )

AL-GAMMAAH AL ISLAMIAH    )

AYMAN AL-ZAWAHIRI    )

ABU ZUBAYDH                                              )
                                                        )
KHALID SHEIKH MOHAMMED                                   )
                                                        )
ABU ABDUL RAHMAN                                         )
                                                        )
ABDUL RAHMAN YASIN                                       )
                                                        )
AL-JAEZEERA NEWS AGENCY                                  )
Al-Jazeera Information Center                            )
P.O. Box 724                                             )
Dalton, GA 30722                                         )
                                                        )
FORMER AL-JAZEERA                                        )
GENERAL MANAGER MOHAMMED                                 )
JASMIN AL-ALI AND TWO FORMER                             )
EMPLOYEES                                                )
                                                        )
SCHREIBER & ZINDEL                                       )
Treuhand-Anstalt                                         )
Kirchstrasse 39                                          )
FL-9490 Vaduz, Liechtenstein                             )
                                                        )
DR. FRANK ZINDEL                                         )
Sonnblickstrasse 7                                       )
9490 Vaduz, Liechtenstein                                )
                                                        )
ENGELBERT SCHREIBER                                      )
Schreiber & Zindel                                       )
Treuhand-Anstalt                                         )
Kirkstrasse 39                                           )
9490 Vaduz, Liechtenstein                                )
                                                        )
ENGELBERT SCHREIBER, JR.                                 )
Schreiber & Zindel                                       )
Treuhand-Anstalt                                         )
Kirkstrasse 39                                           )
9490 Vaduz, Liechtenstein                                )
                                                        )
MARTIN WACHTER                                           )
Asat Trust Reg.                                          )
Altenbach 8, Vaduz 9490                                  )
Liechtenstein                                            )
                                                        )

Lugano CH-6900 TI                          )
Switzerland                                )
                                           )
                                           )
**ALI GHALEB HIMMAT**                      )
Via Posero 2, Campione d'Italia CH-6911,   )
Switzerland                                )
                                           )
                                           )
**ASAT TRUST REG.**                        )
Altenbach 8, Vaduz 9490                    )
Liechtenstein                              )
                                           )
                                           )
**NADA MANAGEMENT**                        )
**ORGANIZATION, S.A.**                     )
Viale Stefano Franscini 22,                )
Lugano CH-6900 TI                          )
Switzerland                                )
                                           )
**YOUSSEF M. NADA (A/K/A/**                )
**YOUSEFF MUSTAFA NADA)**                  )
Via Arogno 32                              )
Campione d'Italia 6911 Switzerland         )
                                           )
**YOUSSEF M. NADA & CO.**                  )
**GESELLSCHAFT, M.B.H.**                   )
c/o                                        )
YOUSSEF M. NADA                            )
Via Riasc 4                                )
Campione d'Italia 6911 Switzerland         )
                                           )
**BARZAN E-TIKRITI a/k/a/ BARZAN**         )
**IBRAHIM HASAN**                          )
                                           )
**METALOR**                                )
B.P. 29                                    )
Rue des Aquées                             )
28190 Courville sur Eure                   )
France                                     )
                                           )
**BANCA DEL GOTTARDO**                     )
Viale S. Franscini 8                       )
CH-6901 Lugano                             )
Switzerland                                )
                                           )
                                           )
                                           )
                                           )

TERRORIST HIJACKERS                                    )
                                                       )
The Estate of ABDULAZIZ AL OMARI                       )
                                                       )
The Estate of WAIL AL SHEHRI                           )
                                                       )
The Estate of WALEED M. AL                             )
SHEHRI                                                 )
                                                       )
The Estate of SATAM M.A. AL                            )
SUQAMI                                                 )
                                                       )
The Estate of MOHAMMED ATTA                            )
                                                       )
The Estate of FAYEZ AHMED, A/K/A/                       )
BANIHAMMAD FAYEZ                                       )
                                                       )
The Estate of AHMED AL-GHAMDI                           )
                                                       )
The Estate of HAMZA AL-GHAMDI                           )
                                                       )
The Estate of MARWAN AL-SHEHHI                          )
                                                       )
The Estate of MOHALD AL-SHEHRI                          )
                                                       )
The Estate of KHALID AL-MIDHAR                          )
                                                       )
The Estate of NAWAF AL-HAZMI                            )
                                                       )
The Estate of SALEM AL-HAZMI                            )
                                                       )
The Estate of HANI HANJOUR                              )
                                                       )
The Estate of MAJED MOQUED                              )
                                                       )
The Estate of SAEED AL GHAMDI                           )
                                                       )
The Estate of AHMED IBRAHIM A. AL                       )
HAZNAWI                                                )
                                                       )
The Estate of AHMED AL NAMI                             )
                                                       )
The Estate of ZIAD SAMIR JARRAH                         )
                                                       )
ZACARIAS MOUSSAUI                                      )

ESTATE OF MUHAMMAD ATEF )
)
THE TALIBAN )
)
MUHHAMAD OMAR )
)
MUSLIM BROTHERHOOD: )
)
    SYRIAN BRANCH )
)
    EGYPTIAN BRANCH )
)
    JORDANIAN BRANCH )
)
    KUWAITI BRANCH )
)
    IRAQI BRANCH )
)
AND, )
)
JOHN DOES 1-99 )
)
        Defendants. )
)

## COMPLAINT

1.    On September 11, 2001, Islamic terrorists perpetrated an attack on the United States that was unprecedented in history. On that day, over 3,000 Americans were killed in simultaneous attacks on the World Trade Center in New York City and the Pentagon in Arlington, Virginia. The attacks were not isolated incidents, but rather a coordinated effort by Islamic Terrorist Organizations. The attacks of September 11, 2001 had been planned for years by an extensive network of Islamic militants with the support,

1

aid and assistance of banks, governments, and individuals. Plaintiffs are the Estate and immediate family of John Patrick O'Neill Sr., former head of the F.B.I.'s counterterrorism division and the world's foremost expert on Islamic terrorism and Osama Bin Laden's terror network. John Patrick O'Neill, Sr. was killed in the attacks on the World Trade Center.

2.      John Patrick O'Neill, Sr. became Chief of Security for the World Trade Center less than two weeks prior to the September 11th attacks. On the morning of Septembere 11, 2001, John Patrick O'Neill Sr. was in his office in the North Tower at the time the first plane hit the South Tower. He immediately left his office and headed to the lobby of the South Tower to determine what had happened, and to assess the damage. A command post was set up in the lobby of the South Tower from where he was able to direct the rescue efforts of the first responders. When the second plane hit the North Tower, he returned there to coordinate the rescue efforts in that building, and was killed when that building collapsed.

3.      On the morning of September 11, 2001, Defendants Marwan al-Sheehhi, Fayez Ahmed a/k/a/ Bamihammad Fayez, Ahmed al-Ghamdi, Hazma al- Ghamdi, and Molahd al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower (Tower Two) of the World Trade Center in New York.

4.      On the morning of September 11, 2001, Defendants Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower (Tower One) of the World Trade Center in New York.

2

5. On the morning of September 11, 2001, Defendants Khalid al-Midhar, Nawalf al-Hazmi, Salem al-Hazmi, Hani Hanjour, and Majed Moqued hijacked American Airlines Flight 77, bound from Dulles Airport in Sterling, Virginia, to Los Angeles, California and crashed it into the Pentagon in Arlington, Virginia.

6. On September 11, 2001, Defendants Zihad Jarrah, Ahmed Al-Haznawi, Saeed Al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark, New Jersey to San Francisco, California with the intention of crashing that plane into either the United States Capitol building or the White House. In a heroic act of defiance and courage, the passengers of Flight 93 overtook the hijackers, and the plane crashed in Shanksville, Pennsylvania prior to reaching its target in Washington, D.C.

7. All nineteen (19) hijackers were members of Osama Bin Laden's Al Qaeda network. All received sponsorship, funding and training through the Al Qaeda network.

8. Plaintiffs move for judgment against Defendants, jointly and severally. In support of their Complaint, Plaintiffs allege as follows:

## JURISDICTION, VENUE AND CHOICE OF LAW

9. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1330(a), 1331, and 1332(a)(2). Venue is proper in this District Court pursuant to 28 U.S.C. §1391(f)(4).

10. Actions for wrongful death, personal injury, and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents –

3

within the meaning of 28 U.S.C. §1605(a)(7) – are unique causes of actions arising out of federal counter-terrorism statutes and are controlled by federal law.

11.     By its actions and the actions of its agencies and instrumentalities, Defendant the Republic of Iraq and its agencies and instrumentalities forfeited their right to claim immunity under the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and 1605(a)(7).  Pursuant to 28 U.S.C. §1605(a)(7) and Pub L. 104-208, Div. A., Title I, §101(c), 110 Stat. 3008-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)), all defendants who are officials, employees, or agents of the foreign state defendants are individually liable to Plaintiffs for damages caused by their acts which resulted in the death of John Patrick O'Neill, Sr.

12.     Defendant the Republic of Iraq by its actions and the actions of its agencies and instrumentalities described herein, conducted commercial activity that had a direct effect on the United States, and they are not immune pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. §1605(a)(2).

13.     Defendant the Republic of Iraq and its agencies and instrumentalities described herein, are subject to liability for said acts resulting in personal injury and death in the United States caused by the tortious act or omission of the foreign state and its officials and employees while acting within the scope of their office or employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. §1605(a)(5).

14.     Defendant the Republic of Iraq is a foreign state and was designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and section 602(A) of the Foreign Assistance Act of 1961 (22 U.S.C. §2371) – from the passage of the Act in 1979 until 1982, and from 1990

4

until May 7, 2003,[1] and was so designated at the time the acts complained of herein occurred. Iraq provided material support and resources to the Al Qaeda terrorist organization. Iraq funded, directed, and trained Al Qaeda terrorists and is therefore a sponsor of Al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605 note.

15.    Defendant the Republic of Iraq was designated a state sponsor of terrorism at the time the acts complained of herein occurred, and is therefore subject to liability for said acts and for provision of material support for said acts resulting in injury and death in the United States as a result of torture, extrajudicial killings and aircraft sabotage, and has forfeited its right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. §1605(a)(7).

16.    The actions of Defendants as described herein subjected the Plaintiffs' decedent John Patrick O'Neill, Sr., to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)).

17.    In carrying out these terrorist acts that resulted in the injury and extrajudicial killing of John Patrick O'Neill, Sr., the actions of each Defendant were conducted under actual or apparent authority, or under color of law.

18.    As set forth above and below, Defendants, jointly and severally, aided, abetted, sponsored, materially supported, and conspired to proximately cause the death and injury of John Patrick O'Neill, Sr., through and by reason of acts of international terrorism. These terrorist activities constitute violations of the law of nations otherwise

---

[1] On April 16, 2003, Congress enacted the Emergency Wartime Supplemental Appropriations Act § 1503 Public Law 108-11, 115 Stat. 579. On May 7, 2003, the President exercised the authority granted to him by Congress in the Act, and, in effect made seized Iraqi assets unavailable for satisfying judgments in suits against the Republic of Iraq.

referred to as contemporary international law, including those international legal norms prohibiting torture, genocide, air piracy, terrorism, and mass murder as repeatedly affirmed by the United Nations Security Council.

19. As a result of Defendants' sponsorship of terrorism in violation of the law of nations and contemporary principles of international law, the Plaintiffs suffered injury and damages as set forth herein. Violations of the law of nations and of international agreements include but are not limited to:

(1) The Universal Declaration of Human Rights, Dec 10, 1956 G.A. Res. 217(A)(III), U.N. Doc A/810, at 71 (1948);

(2) The International Covenant of Political and Civil Rights, art. 6 (right to life), U.N. Doc. A/6316, 999 U.N.T.S. (1992);

(3) The Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112;

(4) The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/158 (1987);

(5) The Convention on the High Seas, arts. 14-22 (piracy) 13 U.S.T. 2312, T.I.A.S. No. 5200 (1962).

## THE PARTIES

6

20.    Plaintiff John Patrick O'Neill, Jr. is a United States citizen and domiciliary of the State of Maryland. He is the son of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

21.    Plaintiff Christine Irene O'Neill is a United States citizen and a domiciliary of the State of New Jersey. She is the widow of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

22.    Plaintiff Carol O'Neill is a United States citizen and a domiciliary of the state of New Jersey. She is the daughter of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

23.    Plaintiff Dorothy A. O'Neill is a United States citizen and a domiciliary of the State of New Jersey. She is the mother of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

24.    Plaintiffs' decedent John Patrick O'Neill, Sr. was a United States citizen and domiciliary of the State of New Jersey. He was killed in the September 11, 2001 attacks on the World Trade Center.

25.    Plaintiff the Estate of John Patrick O'Neill, Sr. is the legal entity created to recover damages on behalf of John Patrick O'Neill, Sr., deceased, and his heirs-at-law arising from the September 11, 2001 terrorist attack on the World Trade Center. Plaintiffs John Patrick O'Neill, Jr. and Christine Irene O'Neill are Co-Executors of the Estate of John Patrick O'Neill Sr., deceased.

26.     Defendant, the Republic of Iraq (hereinafter "Iraq")[2] is a foreign sovereign state located in the Middle East and shares borders with Saudi Arabia, Jordan, Syria, Turkey, Iran and Kuwait. The United States did not have formal diplomatic relations with the former government of Iraq, which maintained an office in New York, the Permanent Representative of Iraq to the United Nations, 14 East 59th Street, New York, NY, 10021. Iraq maintains an Interest Section in the Algerian Embassy in Washington, D.C., located at 2137 Wyoming Ave, N.W, Washington, D.C. 20008.

27.     This court should take judicial notice that Defendant The Republic of Iraq has been found to be liable as a foreign state supporting international terrorism under 28 U.S.C. § 1605(a)(7) to victims of state sponsored terrorism for the acts and actions of Defendant Al Qaeda in cases before this court, namely *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (DDC 2000). Defendant the Republic of Iraq is *collaterally estopped* in this action from denying that it is liable for the acts and actions of Defendant Al Qaeda.[3]

28.     Defendant, the Iraqi Intelligence Agency, also known as ("a/k/a") Mukhabarat, a/k/a the Fedayeen, a/k/a Al-Qare, a/k/a Unit 999, a/k/a M-8 operations, was the intelligence and operational entity in charge of conducting clandestine operations for the Iraqi government and was an agency, instrumentality, and/or organ of the Iraqi government.

29.     This court should take judicial notice of the fact that Defendant, The Iraqi Intelligence Agency has been found to be liable as a foreign state supporting international terrorism under 28 U.S.C. § 1605(a)(7) to victims of state sponsored terrorism for the acts

---

[2] In April 2003, U.S. Armed forces overthrew the regime of Saddam Hussein. Any successor government of Iraq remains liable for the state-sponsored acts of terrorism of its predecessor government.

and actions of Defendant Al Qaeda in cases before this court, namely *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (DDC 2000).

30.     Defendants Saddam Hussein, the Estate of Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

31.     Defendants Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg., Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Squami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi,

Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, and John Does 1-99 are individuals, organizations, banks, and charities located all over the world who conspired with Osama Bin Laden, Al Qaeda, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as Al Qaeda front organizations and actively support its terrorist activities. Some of those organizations are purely a sham front for Al Qaeda.

32.     In a similar fashion, some of the individual Defendants operate apparently legitimate businesses, while maintaining a secret dual role as Al Qaeda operatives, and others are full-fledged members of Al Qaeda who operate openly.

33.     Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd. and The Asat Trust.

34.    Upon information and belief, the Al Taqwa Defendants have financed and laundered money for Arab and Islamic political and militant groups including the Algerian Armed Islamic Group (GIA) and the Egyptian Gala'a al-Islamiya, Islamic terrorist groups with links to Bin Laden and his Al Qaeda organization. Additionally, international investigations indicate that Al-Taqwa facilitated the movement of Bin Laden's money around the world in the late 1990's, a task made easier because its complex structure was designed to prevent scrutiny of its operations.

35.    The Al Taqwa Defendants were founded by Defendant Yousef M. Nada, and its other principals are Defendants Ali G. Himmat, Ahmed Huber and Mohamed Mansour. Defendants Huber and Mansour are senior members of the Muslim Brotherhood.

36.    Defendant Al Taqwa Bank is part of Defendant Al Taqwa Trade, Property and Industry Company which is located in Vaduz, Liechtenstein. This entity is also known as Himmat Establishment, run by a partner of Nada who, like Nada, is a member of the Egyptian Islamic Brotherhood. Although Egyptian-born, Mr. Nada is a naturalized citizen of Italy. Mr. Nada also is a member of Jamaa al-Islamiya, which is directly allied to Al Qaeda through Dr. Ayman al Zawahiri, second in command to Osama Bin Laden. According to U.S. Officials, Mr. Nada had close personal contact with Saddam Hussein.

37.    Shortly after dual U.S. Embassy bombings in Kenya and Tanzania by Al Qaeda in 1998, U.S. intelligence agencies tracked telephone contact between Al Taqwa, members of Bin Laden's inner circle, and Albert "Ahmed" Huber, a convert to Islam in the 1960's who has publicly expressed support for Al Qaeda. Huber has acknowledged that Ahmad I. Nasreddin, a/k/a Hadj Ahmed Nasreddin, a/k/a Ahmed Idriss Nasreddin, is,

11

in fact, an Al Taqwa founding member and bank shareholder who was very active in financing and operating the Islamic Cultural Institute of Milan, which follows the violent teachings of convicted terrorist Omar Abdul Rahman. The Institute was frequently visited by known Al Qaeda terrorists. Upon information and belief, the Institute is known in Western intelligence communities as one of the main Al Qaeda stations in Europe and was used to move weapons, men, and money around the world.

38.     After September 11, 2001, Al Taqwa changed its name to the Nada Management Organization SA in an attempt to avoid scrutiny. Al Taqwa and the Nada group, as well as their four principals – Nada, Himmat, Huber, and Mansour, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of Al Qaeda.

39.     Defendant Schreiber & Zindel of Vaduz, Liechtenstein, is a legal entity involved in money laundering activities on behalf of Al Qaeda and Al Taqwa Bank, according to documents from the Government of Liechtenstein. Upon information and belief, revenues from the sale of Iraqi oil under the United Nation's food-for-oil program were laundered to help finance Al Qaeda. Laundering activity, undertaken with the knowledge of Iraqi officials including Defendant the late Uday Hussein, the eldest son of Saddam Hussein, was undertaken through many of the same middlemen in Switzerland, Liechtenstein, and Italy that administered funds on behalf of sanctioned Al Taqwa bank and other fiduciaries associated with the Muslim Brotherhood.

40.     Defendant Asat Trust Reg. of Baduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001. Defendant Yousef M. Nada founded and operated Asat Trust Reg. Defendants Martin

12

Wachter and Erwin Wachter of the Defendant firm Sercor Treuhand Anstalt based in Liechtenstein, represented Asat Trust Reg.

41.    Upon information and belief, Defendants Martin Wachter, Erwin Wachter, and Schreiber and Zindel engaged in money laundering on behalf of Al Taqwa and Al Qaeda. Their assets have not been frozen by the United States after the events of September 11, 2001.

42.    Defendant Barzan e-Tikriti is Defendant Saddam Hussein's half-brother and the former finance chief for Saddam Hussein's private financial empire. For twenty years, e-Tikriti ran Hussein's network from Lugano Switzerland while simultaneously acting as Iraq's chief delegate to the United Nations' local Swiss headquarters. Upon information and belief, Defendant e-Tikriti laundered money through the Swiss bank Defendant Banca del Gottardo and through the holding company, Mediterranean Enterprises Development Projects (MEDP), moving approximately five billion dollars annually from Switzerland to offshore companies in Liechtenstein, Panama and the Bahamas, and eventually transferred some of those funds to the Al Qaeda network. In addition, e-Tikriti used a Swiss metallurgy firm, Defendant Metalor, to store and transform gold into gold bars, which were then sold for currency. Upon information and belief, Defendant Hussein's financial network was utilized to support Al Qaeda and the terrorism network.

43.    Following its defeat in the 1991 Gulf War, Iraq's approach to dealing with the United States was to resort to terrorism. To achieve its goals, Iraq associated with various terrorist groups. One was the Iranian opposition group Mujahideen-e-Khalq (MEK), that had ties to Ramzi Yousef, who had entered New York in 1992 using an Iraqi

13

passport, and was later convicted in the 1993 World Trade Center bombing. The MEK reportedly also assisted Osama Bin Laden. The MEK reportedly assisted Osama Bin Laden's escape to Eastern Iran after the attacks of September 11, 2001. Eastern Iran is controlled by a Sunni Muslim enclave that was under heavy Iraqi influence.

44.     Ramzi Yousef also gave Iraq a channel to Defendant Khalid Sheikh Mohammed who is a high level Al Qaeda operative and Yousef's uncle. Defendant Mohammed is regarded to be the mastermind of the 1993 World Trade Center bombing and the September 11th attacks as well. Iraq maintained a direct link to Al Qaeda and Khalid Sheikh Mohammed through Razmi Yousef.

45.     Defendant Abu Musab Zarqawi is a senior Al Qaeda member who escaped through Iran to Iraq following the U.S. attack on Afghanistan. While in Iraq, Zarqawi received medical attention in Baghdad where he remained to recuperate for several months. During the months Zarqawi remained in Iraq, he was protected and shielded from U.S. government efforts to arrest him by the Iraqi regime.

46.     Defendant Zarqawi was also a leader of the Ansar al-Islam which operated in Northern Iraq to assist the Iraqi regime in going after Kurdish dissidents. Defendant Abu Waiel was a senior Iraq Intelligence agent who, along with Defendant Zarqawi, operated the Ansar al-Islam camp.

47.     Defendant Al Jazeera, the Arab media outlet, has played a significant role serving as a secret conduit to convey information back and forth from Defendant Iraq to Al Qaeda. Al Jazeera worked with the Iraqi Intelligence Agency, the Mukhabarat, to deliver propaganda of the Iraqi regime and wittingly assisted Al Qaeda. Al Jazeera has

14

assisted greatly in the efforts by Al Qaeda to coordinate with the Iraqi regime to conduct violence and acts of terrorism against the United States.

48.    Documents captured since the April 2003 U.S. military action in Iraq reveal that certain employees of Al Jazeera received substantial funding for their efforts from the Iraqi regime. Defendant Mohammed Jaseem al-Ali and two other employees of Al Jazeera were identified in documents captured in the April 2003 U.S military action in Iraq to have received substantial funding from the Iraqi regime in exchange for acting as liaisons between Iraq and Al Qaeda. One document reveals that Al Jazeera passed letters from Osama Bin Laden to Saddam Hussein. Another document headed "Presidency of the Republic, Mukhabarat Service" revealed contact between the Iraqi Intelligence Agency and Defendant al-Ali.

49.    Defendant The Muslim Brotherhood numbers some 70 branches around the world. Defendant Egyptian Islamic Jihad is part of the Egyptian branch of the Muslim Brotherhood, to which most of the September 11th hijackers belonged. Defendant Mohammad Atta belonged to three professional engineering associations controlled by the Muslim Brotherhood. Defendants Mohammad Zammar and Mouman Darkazanli were two Al Qaeda operatives who belonged to the Syrian Branch of the Muslim Brotherhood, and who directed the Al Qaeda cell in Hamburg, Germany. Both Zammar and Darkazanli were closely associated with Atta. Zammar was Atta's mentor and is credited with recruiting Atta into Al Qaeda. Defendant Khalid Mohammed is known to have met with Defendant Atta in Hamburg, Germany.

50.    The relationship of the Syrian Muslim Brotherhood members with Osama Bin Laden and later Al Qaeda goes back more than 20 years. Over the years, Osama Bin

15

Laden and his brother Mahrous have provided financial assistance to the Syrian Muslim Brotherhood.

51.     The Syrian Muslim Brotherhood was established to undermine the regime of the late Syrian President Hafez al-Assad.  During the 1980's Iraq worked with the Syrian Muslim Brotherhood, a group with intellectual leanings similar to Al Qaeda, against the regime of Syria's President Assad. The Baath party, secular in nature, was the ruling party of both Syria's President Assad and Iraqi President Saddam Hussein. Despite the Muslim Brotherhood's antipathy toward Baath secularism, Iraqi support for the Syrian Muslim Brotherhood continued until the end of the Saddam Hussein's regime in April 2003.  As such, Iraqi support of the Hamburg cell comprising the September 11th hijackers flowed to their Syrian Muslim Brotherhood backers, all of whom belonged to Al Qaeda.  Defendants Faroq Hijazi and Ma'Amouri, members of the Iraqi Intelligence Agency, frequently met with Defendant Atta in Hamburg. In effect, Mohammed Atta, through his close connections to Iraqi intelligence and his activities as a conduit of information and funding, became an agent of the Iraqi Intelligence Agency.

52.     In furtherance of Iraq's support of Al Qaeda, Islamic terrorists associated with Al Qaeda in the southern Philippines killed two American hostages in recent years. The Philippine based terrorists admitted they received money from Iraqis close to Iraqi President Saddam Hussein.  Hamsiraji Sali, a local commander of the Abu Sayyaf terrorist group, admits to having received some $20,000 per year from Iraqi supporters. The payments provide additional evidence of a link between Iraq and the Abu Sayyaf, a group with long-standing ties to Al Qaeda and its global terror network.

16

53.     Philippine officials also had discovered that Defendant Husham Hussein, an Iraqi diplomat, had received phone calls from an Abu Sayyaf member linked to the October 2, 2002 bombing in the southern port city of Zamboanga that killed one American serviceman and badly wounded another.  The Iraqi diplomat was expelled from the Philippines.

54.     Defendant Abu Sayyaf was founded more than a decade ago with help from Jamal Mohammad Khalifa, a brother-in-law of Al Qaeda leader Osama Bin Laden.

55.     Defendants John Does 1-99 are other officials, employees, and/or agents of the Republic of Iraq, or others, whose identities are presently unknown, who performed acts that resulted in acts of terrorism, including the actions relating to the attacks on the World Trade Center on September 11, 2001 which caused the extrajudicial killing of Plaintiffs decedent John Patrick O'Neill, Sr.  Defendants John Does 1-99 acted as agents of the Republic of Iraq, performed acts within the scope of their office, employment and/or agency, within the meaning of 28 U.S.C. § 1605 note, which caused the extrajudicial killings described below.

## STATEMENT OF FACTS

56.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Saddam Hussein, the Estate of Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden,

17

The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg., Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Squami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, and John Does 1-99, who have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more.

57.     Iraq has sworn revenge against the United States since 1992 for Iraq's humiliating defeat in the Persian Gulf War. Since Iraq could not defeat the U.S. Military, it resorted to terror attacks on U.S. citizens. In order to avoid another confrontation with

18

U.S. military forces, Iraq contracted with or sponsored Islamic fundamentalists who were willing to commit terrorist attacks on Iraq's behalf. Indeed, in 1993, Iraqi agents tried to destroy the World Trade Center by planting a bomb in the World Trade Center parking garage.

58.     For many years, Al Qaeda wanted to drive the United States from the Arabian Peninsula, topple Middle Eastern governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran. Over the years, Al Qaeda has grown, as it absorbed or became allied with other like-minded Islamic terrorist groups, including the Egyptian Islamic Jihad.

59.     Over the past 10 years, Iraq's leadership and Al Qaeda shared a virulent hatred of the United States.

60.     As early as 1992, Al Qaeda terrorists established close working relations with Iraqi Intelligence agents in Iraq, the Sudan, Afghanistan, and elsewhere. Soon thereafter, Iraqi Intelligence decided to support Al Qaeda and to employ Al Qaeda terrorists willing to carry out Iraq's terror attacks. The Iraq-Al Qaeda relationship benefited Iraq because it provided that state with trained terrorists willing to die in terror attacks. As a secular state, Iraq does not have a large number of citizens wishing to become martyr warriors. In addition, by using Al Qaeda suicide terrorists, Iraq could disavow involvement in attacks and avoid retribution. The relationship benefited Al Qaeda who received support, funding, facilities, and training that it needed to carry out its terror campaigns.

19

61.    During the mid-1990's Iraq began actively supporting Al Qaeda operations by providing intelligence, training, weapons, supplies, passports, travel documents, and financial support to co-conspirators. Significantly, one of Iraq's training camps contained the fuselage of a Boeing 707 used to train Al Qaeda terrorists in hijacking a commercial aircraft. The training camp was established at Salman Pak by members of the Iraqi intelligence service (Mukhabarat), who had contact with some of the September 11th hijackers. The terrorist training camp adjoins a facility at Salman Pak used for chemical weapons development. Al Qaeda members who were at Salman Pak may have also received training in chemical weapons.

62.    Al Qaeda, backed by Iraq, carried out the September 11th terror attacks with the financial and logistical support of numerous individuals and organizations. These individuals and organizations provided Al Qaeda with the means to recruit, train, and employ thousands of terrorists, including the twenty assigned to the heinous mission to murder United States citizens and destroy U.S. landmarks on September 11, 2001.

63.    This lawsuit seeks to strip the assets of Iraq, Al Qaeda, Bin Laden, and those individuals and organizations who participated in or supported the September 11th terror attacks and to recover compensatory and punitive damages for the Plaintiffs. By doing so, Plaintiffs hope to obtain a measure of justice and to deter future acts of terrorism.

### The Birth of Al Qaeda

64.    Starting in 1989, an international terrorist group emerged dedicated to opposing non-islamic governments with brutal force and terrifying violence. This organization grew out of the "mekhtab al khidernat" (the "Azzam Service Center")

20

organization which maintained offices in Peshawar, Pakistan, and received funds from Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises, among others.

65. Under the leadership of Defendants Bin Laden, Muhammad Atef, a/k/a "Abu Hafs al Masry," Sheikh Tasyir Abdullah, Abu Fatima, Abu Khadija, together with "Abu Ubaidah al Banshiri" (Deceased in 1996), Ayman al Zawahiri and others, the Azzam Service Center expanded, created terrorist cells in various parts of the world, including Afghanistan, Pakistan, and the United States, financed and supported other terrorist groups dedicated to committing acts of violence, murder, destruction and mayhem. From approximately 1989 until the present, this terrorist group called itself "Al Qaeda" ("the Base").

66. At all relevant times, Al Qaeda was led by Bin Laden. Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Bin Laden and Al Qaeda, committing them to become martyrs in their depraved cause.

67. Al Qaeda actively and vehemently opposed the United States for several reasons. First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believed the United States was providing essential support for other "infidel" nations and organizations, particularly the government of Egypt, Israel, and the United Nations, which Al Qaeda regarded as enemies. Third, Al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in Muslim-dominated countries afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993. Al Qaeda viewed these pretextual preparations for an American

21

occupation of Islamic Countries. In particular, Al Qaeda opposed the continued presence of American Military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War. Fourth, Al Qaeda opposed the United States Government because of the arrest, conviction, and imprisonment of Al Qaeda members or other terrorists, with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman who was convicted of conspiring to bomb bridges and tunnels in New York City. Fifth, Al Qaeda believed United Nation sanctions against Iraq were orchestrated by the United States out of eagerness to destroy Iraq.

68.   One of the Al Qaeda's principal goals was to use violence to drive the United States armed forces out of Saudi Arabia and Somalia. Members of Al Qaeda issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

69.   At least as early as 1991, Bin Laden and Al Qaeda began working closely with Defendant Ayman al Zawahiri, a/k/a "Abdel Muaz," a/k/a Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a/ "Abu Mohammed," a/k/a "Dr. Mohammed Nur Al-Deen" whose Egyptian Islamic Jihad terrorist group shared Bin Laden and Al Qaeda's goals. Bin Laden had met Zawahiri in Peshawar, Pakistan, in 1987 during the Afghan-Soviet war.

70.   From in or about 1987, until in or about December 1997, Ayman al Zawahiri led the Egyptian Islamic Jihad, a group dedicated to the forceful overthrow of the Egyptian Government and committing violence against the United States, in part, for what Zawahiri believed to be the United States support of the Egyptian Government. Members of the Egyptian Islamic Jihad pledged allegiance to al Zawahiri. Many of the

22

leading members of the Egyptian Islamic Jihad ultimately became influential members of Al Qaeda, including Ayman al Zawahiri and Muhammad Atef. By February 1998, the Egyptian Islamic Jihad led by Al Zawahiri had effectively merged with Al Qaeda and had joined with Al Qaeda in targeting United States citizens. In turn, Al Qaeda and the Egyptian Islamic Jihad in February 1998 founded an umbrella terrorist organization called the "International Islamic Front" for the jihad against Jews and Crusaders. In May 1998, Bin Laden declared a fatwa in the name of the International Islamic front for the jihad against Jews and Crusaders, to "kill the Americans and their allies -- civilians and military."

71.    Al Qaeda had a command and control structure which included a "majalis al shura" (consultation council) of 10 members that discussed and approved major undertakings, including terrorist operations. Bin Laden, Muhammad Atef, a/k/a "Abu Hafs," Ayman al Zawahiri, Saif al Adel, Mamdouh Mahmud Salim, a/k/a/ "Abu Hajer," and Abdullah Ahmed Abdullah, a/k/a "Abu Mohammed el Masry," a/k/a "Saleh," among others, sat on the majalis al shura (or consultation council) of Al Qaeda. Its affiliate, the Egyptian Islamic Jihad, had a Founding Council, on which Ibrahim Eidarous sat.

72.    Al Qaeda also maintained a "military committee" which considered and approved "military" matters. Defendant Muhammad Atef sat on the military committee and was one of Bin Laden's two principal military commanders, together with "Abu Ubaidah al Banshiri," until his death in May 1996. Muhammad Atef had the principal responsibility for supervising the training of Al Qaeda members. Saif al Adel also served on the military committee reporting to Muhammed Atef. He took over the military committee after Atef's death.

23

73.    Al Qaeda functioned both on its own and as a conduit for other terrorist organizations in other parts of the World that shared its ideology, such as the Egyptian Islamic Jihad, Ahmed Refai Taha, a/k/a "Abu Yasser al Masri," and a member of jihad terrorist groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, Indonesia, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia.  Al Qaeda camps were used to train terrorists to fight in Islamic causes, such as supporting Pakistan in its dispute with India over the province of Kashmir.  Al Qaeda maintained terrorist cells and personnel in a number of countries to facilitate its activities, including Kenya, Germany, Tanzania, the United Kingdom, Canada, and the United States.

74.    Bin Laden and Al Qaeda also forged alliances with the National Islamic Front in the Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

75.    At various times from as early as 1989, Bin Laden, and others known and unknown, ran terrorist training "camps and guesthouses" in various areas, including Afghanistan, Iraq, Iran, Pakistan, the Sudan, Somalia, Kenya, Malaysia, Philippines, and Germany for the use of Al Qaeda and its affiliated groups.  Mamdouh Mahmud Salim and Abu Hajer al Iraqi managed some of these training camps and guesthouses in Afghanistan and Pakistan.

76.    Since 1991, Bin Laden, Al Qaeda, and many of their co-defendants unlawfully, willfully and knowingly combined, conspired, confederated, and agreed to

24

murder and injure United States citizens throughout the world, including in the United States, and to conceal their activities and methods by, among other things, establishing front companies, providing false identity and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries, and seeking to detect and kill informants.

## Iraqi Terrorism

77.    Since the early 1990s, Iraq and Iraqi Intelligence have used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for Iraq's Gulf War defeat.  Al Qaeda was Iraq's favorite partner in terror.

78.    Upon information and belief, there have been numerous meetings between Iraqi Intelligence agents and high-ranking Al Qaeda terrorists to plan terror attacks.  One such meeting occurred in 1992, when Defendant Zawahiri (Egyptian Islamic Jihad leader and Al Qaeda officer) met with Iraqi Intelligence agents in Baghdad, Iraq over several days.  An Iraqi serving with the Taliban who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that Iraqi contacts with Al Qaeda began in 1992.  In fact, Abu Iman al-Maliki, who spied on the Kurds as an Iraqi intelligence officer for 20 years, said that the 1992 meeting not only included Iraqi intelligence officers, but also Defendant Dr. al-Zawahiri, top lieutenant of Bin Laden, who was known to have met with Saddam Hussein.

## The 1993 World Trade Center Bombing

79.    On February 26, 1993, a bomb was detonated in the World Trade Center underground parking lot, killing six (6) U.S. citizens and injuring close to one thousand

(1,000). Iraqi sponsored terrorists planned, financed, executed and carried out that World Trade Center bombing.

80. The 1993 World Trade Center bombing took place on the Friday before the two year anniversary of Iraq's defeat in Kuwait, which was February 28, 1991. The anniversary in 1993 was a Sunday, and few people would have been working at the World Trade Center that day; and Iraq and the terrorists wanted to maximize the number of American casualties.

81. During the initial planning of the World Trade Center bombing, Mahmud Abu Halima (who was later convicted for his role in the bombing), was in regular and frequent contact with his uncle, Kadri Abu Bakr, who lived in Iraq and had been a member of a PLO faction allied with Saddam Hussein. Shortly after these calls, the mastermind of the bombing, Ramzi Ahmed Yousef, an Iraqi Intelligence agent, traveled to the United States using travel documents forged in Kuwait during the Iraqi occupation of that country in 1991.

82. Ramzi Yousef arrived in New York on September 1, 1992 using an Iraqi passport and requesting asylum. On December 31, 1992, he presented photocopies of Passports for Abdul Basit at the Pakistani consulate in New York, claiming to be Basit and requesting replacement of his "lost" passport. The real Basit was a Pakistani citizen who had moved to Kuwait and disappeared during the Iraqi occupation in August 1990. Iraqi Intelligence had access to the Kuwaiti Interior Ministry files and upon information and belief, inserted Yousef's fingerprints into the file and provided him with photocopies of two older passports from Basit's file. The Pakistani Consulate, accordingly, provided Yousef a temporary passport, based on the false documents. This provided Yousef with a

26

means to escape the U.S. two days after the World Trade Center bombing. In fleeing the United States after the bombing, Yousef first traveled through Baluchistan, an uncontrolled region of Iran straddling the border of Iran and Pakistan with strong ties to Iraq. By the following year, 1994, Yousef was living in the Philippines. He fled from there; however, after authorities discovered a plan he was working on to bomb United States' airliners. Yousef fled to Pakistan and was eventually sheltered at an Al Qaeda guesthouse. He was arrested in February 1995 in Pakistan and extradited to the U.S. for prosecution and was eventually convicted in the 1993 World Trade Center bombing conspiracy.

83.     Abdul Rahaman Yasin, who was born in the United States to Iraqi parents but had been raised in Iraq, was questioned in New York and New Jersey in connection with the World Trade Center bombing, but was released after appearing to cooperate with U.S. officials. He fled the country the next day and traveled to Baghdad, Iraq. U.S. prosecutors later learned that he, along with others, had prior training in bomb making, and had mixed the chemicals and constructed the bomb that was used on the World Trade Center. Iraqi intelligence knew of Yasin's presence in Iraq and provided him with refuge. On August 4, 1993, Yasin was indicted in absentia for the World Trade Center bombing.

84.     In June 1994, Yasin was seen in Baghdad by an ABC news correspondent who was told that Yasin worked for the Iraqi government. U.S. law enforcement officials confirmed that fugitive Yasin worked for the Iraqi government. U.S. law enforcement officials confirmed that fugitive Yasin has been sheltered in Iraq, a continuing violation of United Nations Security Council Resolution 687, which makes it unlawful to harbor a

27

suspected terrorist. In June 2002, Yasin was interviewed in Baghdad by Leslie Stahl from CBS. Upon information and belief, Yasin still remains in Iraq.

85.    Ramzi Ahmed Yousef, Mohammed Salameh, Nidal Ayyad, Mahmud Abu Halima and Ahmad Mohammed Ajaj were all eventually convicted in the Southern District of New York for the 1993 conspiracy to bomb the World Trade Center.

86.    Following his arrest in 1995, Ramzi Yousef told U.S. investigators that his intent was to create an explosion that would cause one of the World Trade Center Towers to fall over onto the other, destroying both and causing massive American casualties. Yousef had also planned to use sodium cyanide to create a toxic cyanide gas cloud throughout the area that would poison those in the building. Fortunately, the sodium cyanide was consumed in the blast and vaporized. Before the Gulf War, Iraq had the largest and most diversified terrorist chemical weapons program in stockpiles of sodium cyanide, and had experience in the late 1980's using chemical weapons against its Kurdish population. Upon information and belief, it was Iraq that supplied Yousef with the sodium cyanide.

87.    Upon information and belief, Al Qaeda terrorists met and conspired in November, 1995, with Iraqi Intelligence and the Iranian Hezbollah to bomb the Khobar towers complex located in Dhahran, Saudi Arabia. Their plan called for the detonation of a truck bomb outside an apartment complex that was used as a barracks for United States servicemen. The resultant attack on Khobar Towers of June 25, 1996, took the lives of 19 U.S. Servicemen. Fearing further attacks by Bin Laden and Al Qaeda, some Saudi government officials and businessmen agreed to provide financial support to Al Qaeda and began funneling millions of dollars to charities that would then forward the money to

28

Al Qaeda. Some of these charities were Madras schools which preached a form of Islam that is intolerant of non-Muslims and provided new recruits for terrorism.

### Bin Laden's Return to Afghanistan

88. In 1996, Bin Laden was asked to leave the Sudan by Sudanese officials pressured by the United States to crack down on terrorism. Bin Laden returned to Afghanistan after the Taliban seized control of most of that country. The number of Al Qaeda members and terrorist training camps in Afghanistan grew rapidly following Bin Laden's return. Al Qaeda actively supported the Taliban and violently suppressed all opposition to the Taliban. Bin Laden and Omar developed a very close relationship.

89. From 1996 until 2001, Bin Laden with the financial and logistical support of Omar and others in the Taliban and Iraq and Iraqi Intelligence, created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking their enemies throughout the world. These camps trained men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives. Classes were also given in "how to kill a policeman" and "traps, murder, and terrorist moves."

90. On August 23, 1996, a strengthened Bin Laden issued another *fatwa* declaring a jihad against Americans present in Muslim lands. The message was disseminated throughout all Al Qaeda cells and associated terrorist groups, such as the Egyptian Islamic Jihad. The London Al Qaeda cell, run by Khalid Al Fawwaz under the name Advice and Reformation Committee, and the Egyptian cell, run by al Zawahiri and Abdel Barry, were used to send the *fatwa* to Muslims living in the Western World.

Wadih El Hage was also used by Bin Laden in order to deliver messages, money and terrorist material to Al Qaeda operatives in the U.S. and U.K.

### The Public Merger of Iraqi and Al Qaeda Interests

91.    In February 1997, Bin Laden publicly expressed his support for Iraq in its conflict with the United States, stating:

> "The hearts of the Muslims are filled with hatred towards the United States of America and the American President for American conduct towards Iraq."

92.    Having decided to carry out acts of terrorism, Saddam Hussein, with the advice and prompting of his son and Iraqi Intelligence chief, the late Qusay Hussein and his other son, the late Uday Hussein, head of an Iraqi Intelligence Subdivision known as the "Fedayeen" and "Al-Qare," concluded that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining Iraqi revenge.

93.    Upon information and belief, Iraq agreed to supply arms to Al Qaeda and provide Al Qaeda with access to and training in the use of chemical and biological weapons. Iraq also agreed to instruct Al Qaeda terror trainers at its Salman Pak camp in Baghdad that contained a Boeing 707 used to practice hijacking. Iraq also agreed to supply Al Qaeda terrorists with new identities and passports from Yemen and the United Arab Emirates.

94.    In exchange, Al Qaeda agreed to provide protection from political opponents to Iraq and Saddam Hussein, and to commit assassinations and other acts of violence to create instability in regions of Iraq, particularly Kurdistan, to assist the regime of Saddam Hussein. Al Qaeda further agreed to provide trained terrorists, assassins, and

30

martyrs to carry out terror attacks in concert with Iraq against their common enemies, including the United States.

95. On February 22, 1998, Bin Laden, Khalid Al Fawwaz, and Ayman al Zawahiri of the Egyptian Islamic Jihad issued a fatwa published in the Arabic newspaper Al-Quds stating:

> "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it…"

96. In their February 22, 1998 fatwa, Bin Laden and Al Qaeda expressly referenced the United States' "continuing aggression" towards Iraq as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" they are found:

> "The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless."

97. The Bin Laden and Al Qaeda fatwa also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States' alleged "eagerness to destroy Iraq."

98. Additional fatwas of a similar nature were issued in May 1998 and published in Al-Quds under the banner of the Ulema Union Of Afghanistan. A May 29, 1998 Fatwa issued by Bin Laden called to the use of a nuclear bomb to "terrorize the Jews and Crusaders who were enemies of God." At the time Bin Laden was seeking to obtain nuclear material from Iraq and others who possessed nuclear material and was in the process of developing nuclear weapons.

31

99. Between April 25 and May 1, 1998, two of Bin Laden's senior military commanders, Muhammad Abu-Islam and Abdullah Qassim visited Baghdad for discussions with Saddam Hussein's son – Qasay Hussein – the "czar" of Iraqi Intelligence.

100. The late Qusay Hussein's participation in those meetings highlights the importance of the talks in both symbolic and practical terms. Upon information and belief, as a direct result of those meetings, Iraq again made commitments to provide training, intelligence, clandestine Saudi border crossings, financial support and weapons and explosives to Al Qaeda.

101. Iraqi Intelligence officials met with Bin Laden in Afghanistan several more times. A second group of Bin Laden and Al Qaeda operatives from Saudi Arabia were then trained by Iraqi Intelligence in Iraq to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence. A third group of Bin Laden and Al Qaeda operatives received a month of sophisticated guerilla operations training from Iraqi Intelligence officials later in the Summer of 1998.

102. Despite philosophical and religious differences with Saddam Hussein, Bin Laden continually sought to strengthen and reinforce the support he and Al Qaeda received from Iraq.

103. Upon information and belief, documents recently found in the bombed headquarters of the Mukhabarat, Iraq's intelligence service, reveal that an Al Qaeda envoy was invited clandestinely to Baghdad in March 1998. The documents reveal that the purpose of the meeting was to establish a relationship between Baghdad and Al

32

Qaeda based on their mutual hatred of America and Saudi Arabia. The meeting apparently went so well that it ended with arrangements being discussed for Bin Laden to visit Baghdad.

104.    In March 1998, Bin Laden had reportedly visited Baghdad for consultations. According to Giovanni DeStafant, an international lawyer visiting Baghdad on business, he encountered Bin Laden in the lobby of the five-star Al-Rashid Hotel in Baghdad. They engaged in light conversation.

105.    In mid-July, 1998, Bin Laden sent Dr. Ayaman al-Zawahiri, the Egyptian co-founder of Al Qaeda, to Iraq to meet with senior Iraqi officials, including the Iraqi vice-president Taha Yassin Ramadan. Upon information and belief, the purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign in the United States. Five months later, the American embassies in Kenya and Tanzania were bombed.

106.    Upon information and belief, Iraqi Intelligence officials pledged Iraq's full support and cooperation in exchange for a promise that Bin Laden and Al Qaeda not to incite the Iraqi Muslim Brotherhood inside Iraq to oppose, undermine or attack the regime of Iraqi dictator Saddam Hussein.

107.    During the July 1998 visit, Zawahiri toured a potential site for a new headquarters for Bin Laden and Al Qaeda, and went to an Iraqi military base and nuclear and chemical weapons facility near al-Fallujah in Iraq. Upon information and belief, Dr. Zawahiri observed training by Iraqi Intelligence officials of Al Qaeda operatives at the al-Nasiyirah military and chemical weapons facility in Iraq. In recognition of Bin Laden's and Al Qaeda's leadership role in the terrorist war against the United States, Iraqi

33

officials allowed Zawahiri to assume formal command over the al-Nasiyirah training camp in the name of Bin Laden and Al Qaeda.

### U.S. Embassy Bombings

108.   To demonstrate its commitment to Iraq and its anti-U.S. policies, in the Spring of 1998, Al Qaeda planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya, and Dar Es Salaam, Tanzania.  A, Khalfan Khamis Mohamed, Mustafa Mohamed Fadhil, Mohamed Rashed Daoud Al-'Owali, Sheikh Ahmed Salim Swedan, Fahid Mohamed Aly Msalam and an individual known as Abdulla Azzam were chosen as some of the Al Qaeda terrorists who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

109.   In July and early August 1998, Al Qaeda terrorist Mustafa Mohamed Fadhil, Khalfan Khamis Mohamed, Ahmed Khalfan Ghailini, Fahid Mohammed Ally Msalam, Ahmed the German, Sheikh Ahmed Salim Swedan, Mohamed Sadeek Odeh and Fazul Abdullah Mohammed were stationed in Dar es Salaam where they purchased a 1987 Nissan Atlas truck and outfitted it with oxygen, acetylene tanks, TNT, batteries, detonators, fertilizer and sand bags, creating a massive bomb to be driven into the U.S. Embassy.  Odeh, Fazul Adullah Mohammed and others who participated in the bombings had been with Bin Laden since the early 1990s and Bin Laden's days in the Sudan.

110.   On July 30, 1998, Iraq warned it would take action unless the United Nations embargo was lifted.  Iraq blamed the United States for the United Nations embargo.  On August 4, 1998, Iraq refused to cooperate with the United nations embargo.  On August 4, 1998, Iraq refused to cooperate with United Nations weapons inspectors in Iraq and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

111.    Three days later, on August 7, 1998, at approximately 10:30 a.m., Fazul, Al-'Owhali and Azzam drove a Toyota Dyna truck (outfitted similarly to a Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya, and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4.500 people.

112.    On August 7, 1998, at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and Ahmed the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania, severely damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

113.    On August 6, 1998, shortly before the bombing, Eidarous, an Al Qaeda member in London, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, UAE, claiming responsibility for the embassy bombings under the fictitious name Islamic Army for the Liberation of Holy Places.

114.    At the trial in New York of some of Al Qaeda-U.S. Embassy bombers, some of the defendants elicited testimony in their defense that cited the poor living conditions in Iraq. They blamed those conditions on the U.S.-U.N. sanctions, and used it as motivation and explanation for the Al Qaeda attacks on the Embassies.

### The 1998 U.S. Air Strikes on Al Qaeda

115.    On August 20, 1998, the United States initiated a pre-emptive and retaliatory air strike with cruise missiles on Al Qaeda training camps in Khost, Afghanistan and a factory in Khartoum, Sudan, believed at the time to be a chemical

weapons plant used by the Sudanese and Iraqi governments to manufacture weapons for their use and that of Al Qaeda terrorists.

116.    On August 20, 1998, President Clinton issued a statement on the air strike:

> "Our target was terror…our mission was clear to strike at the network of radical groups affiliated with and funded by Bin Laden, perhaps the preeminent organizer and financier of international terrorism in the world today."

117.    By mid-November, 1998, Saddam Hussein reportedly came to the conclusion (with the advice and prompting of his son and intelligence chief , the late Qusay Hussein), that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of deflecting U.S. attempts to topple his regime.

118.    Shortly thereafter, Iraqi intelligence officials reportedly met with Bin Laden in Afghanistan. Bin Laden, Al Qaeda, and Iraq reportedly agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States. Iraq also reportedly agreed to provide Bin Laden and Al Qaeda with the assistance of an expert in chemical weapons, and Bin Laden reportedly agreed to hunt down Iraqi opposition leaders who cooperated with the United states against Hussein. In furtherance of this agreement, Bin Laden reportedly dispatched four hundred of Al Qaeda's "Afghan" Arabs to Iraq to fight Kurdish dissidents.

119.    In December 1998, after a standoff between the U.N. and Iraq and a discovery of weapons violations in Iraq, the United States with U.N. approval, led a coalition of allies in a four-day air strike on Iraq. Iraqi Trade Minister Muhammed Madhi Salah then stated that he expected terrorist activities against the United States to

*increase* as a result of the bombing of Iraq. The Arabic language daily newspaper Al-Quds Al-Arabic cited the cooperation between Iraq, Bin Laden and Al Qaeda in a late December 1998 editorial which predicted that

> "President Saddam Hussein, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama Bin Laden, whom the United States considers to be the most wanted person in the world."

120.    The editorial noted that this type of cooperation was already taking place, considering that "Bin Laden was planning on moving to Iraq before the recent strike."

121.    Following the December 1998 air strikes on Iraq, Saddam Hussein dispatched Faruq al-Hijazi to Kandahar, Afghanistan in order to meet with Bin Laden and plot their revenge. Al-Hijazi also offered Bin Laden terrorist resources and asylum in Iraq.

122.    The late Qusay Hussein had also dispatched representatives to follow-up with Bin Laden and obtained his firm commitment to exact revenge against the United States for the December 1998 bombing campaign. Iraq offered Bin Laden and Al Qaeda an open-ended commitment to joint operations against the United States and its "moderate" Arab allies in exchange for an absolute guarantee that Bin Laden, Al Qaeda and their allies would not attempt to overthrow Saddam Hussein's regime in Iraq.

123.    To demonstrate Iraq's commitment to Bin Laden and Al Qaeda, Hijazi presented Bin Laden with a pack of blank, official Yemeni passports, supplied to Iraqi Intelligence from their Yemeni contacts. Hijazi's visit to Khandahar was followed by a contingent of Iraqi Intelligence officials who provided additional training and instruction to Bin Laden and Al Qaeda operatives in Afghanistan.

124.    Upon information and belief, Bin Laden, Al Qaeda and Iraq agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States.

125.    "Unit 999" was located at Salman Pak, south of Baghdad.  It was here that training would be given to Al Qaeda fighters to use chemical and biological weapons in sabotage operations in Europe and across the United States.

126.    In 1998, reports revealed that Saudi and Palestinian dissidents were trained in Iraq at secret camps run by an Iraqi Intelligence group known as Unit 999.

127.    A trainer at Unit 999, Abu Mohammad, who had escaped Iraq, confirmed that such training was underway on how to lay bombs and how to use chemical and biological weapons in operations in the Middle East and the West.  Unit 999 ran a course for a number of extremist Middle Eastern groups, including Al Qaeda.  Mohhamad was recruited into Saddam Fedayeen in 1998 and had his first encounter with Bin Laden fighters that year at Salman Pak.

128.    Iraq maintained an advanced chemical and biological weapons program, part of which was located at Salman Pak.  Iraq is one of only three countries in the world producing a highly developed weaponized anthrax.  Sometime during or after 1998, Iraq agreed to help Bin Laden and Al Qaeda develop a laboratory in Afghanistan designed to produce anthrax.

129.    In addition to the al-Nasiriyah and Salman Pak training camps, by January 1999, Bin Laden and Al Qaeda operatives were being trained by Iraqi Intelligence and military officers at other training camps on the outskirts of Baghdad.

38

130. Those locations were the Nahrawan camp at the old Diyala Bridge, southeast of Baghdad and Tell Aswad Ridhwaniya, northwest of Baghdad. The Mukhabarat (Iraqi Intelligence Agency) runs the training facilities at both locations. Relocation occurred due to publicity surrounding Salman Pak, where kamikaze, explosives, and assassination training included "foreigners" said to be Palestinians and Iranians from the Mujahedin-e Khalq (MEK). Iraq supports the anti-Iranian terrorist group, MEK, to which Ramzi Yousef was connected due to his Iraqi background. Bin Laden also reportedly is being sheltered by the Iranian guerilla fighters of the MEK in the eastern portion of Iran. He and close associates reportedly crossed into Iran using smuggling routes with the help of the MEK, and took refuge in caves said to be more extensive and sophisticated than those of the Tora Bora mountain chain in Afghanistan. The MEK, who are fighting a war against the Shiite government of Tehran, are minority Sunnis. They maintain good relations with certain Afghan and Pakistani tribes. When the Iranian government cracks down on the group, MEK members take refuge in the Pakistani or Afghani tribal areas.

131. In January 1999, Iraq began reorganizing and mobilizing Iraqi Intelligence front operations throughout Europe in support of Bin Laden and Al Qaeda. Haqi Ismail, believed to be a member of Iraq's Mukhabarat Secret Service, left Iraq to train in an Afghanistan Al Qaeda camp. Ismael was believed to be a liaison between Iraq, the Taliban, and Al Qaeda and was rewarded with a position in the Taliban Foreign Ministry.

### Attack on the U.S.S. Cole DDG-67

132. In the spring of 2000, Iraqi Intelligence began planning to attack United States warship[s in the Persian Gulf in an effort to prompt a United States withdrawal.

Iraq sought suicide bombers who would employ small boats packed with explosives to ram United States' warships.

133.    On October 12, 2000, Iraqi Intelligence and members of Al Qaeda including Bin Laden, Jamal al-Badawi, Khalid al-Midhar, Mohammed Omar al –Harazi, Walid al Sourori, Fatha Abdul Rahman, Yasser Al-Azzani, Jamal Ba Khorsh, Ahmad Al-Shinni, Raed Hijazi, Jamil Quasim Saeed Mohammed, as well as the two suicide boat bombers Abd Al-Mushin Al-Taifi (deceased)(and a suspect in the August 1998 Embassy bombings) and Hassan Said Awadh Khemeri (deceased) carried out their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17 American sailors and injuring an additional 39.

134.    The Yemeni government investigation reported that the terrorists behind the attack were Islamic extremists who fought the Soviets in the Afghan war and who were tied to the Egyptian Islamic Jihad and Al Qaeda and who were trained in Afghanistan.  Four were arrested in Yemen.  Jamil Qaseri Saeed Mohammed was arrested a year later in Pakistan.  After his arrest, Al-Badawi admitted that he received his instructions to bomb the U.S.S. Cole from Al Qaeda member Al-Harazi whom he had met during the war in Afghanistan.

### Al Qaeda Hijacking of Saudi Airline

135.    On October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 from Saudi Arabia and it had flown to Baghdad, Iraq.  The hijackers were given "asylum" in Iraq.  They were extensively interviewed in the Iraqi press and criticized the Saudi government.



136. Upon information and belief, this hijacking was a message between Bin Laden and Iraq intended to demonstrate that Al Qaeda terrorists could seize control of large commercial aircraft that could be used as a weapon in the hands of suicide terrorists, foreshadowing a coordinated attack that was less than a year away.

### Iraqi Launch of Terror War

137. On January 22, 2001, the Arab language newspaper Al Watan Al Arabi, reported that Saddam Hussein and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies." The newspaper characterized Hussein's statement as calling for an uncompromising campaign and "scorched earth policy."

138. In May 2001, Al Qaeda operatives in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with Saddam Hussein. The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan. This benefited the Hussein regime in Iraq.

139. Also in May 2001, Iraqi physician and kidney specialist Dr. Mohammed Khyal was dispatched from Baghdad to Afghanistan for three days to treat Bin Laden's kidney problem, further demonstrating the important relationship between Iraq and Bin Laden less than four months before the single largest terrorist attack in history.

140. During the May 2001 trial of some of the Al Qaeda defendants who bombed the U.S. Embassies in Africa, the defendants expressed sympathy, solidarity, and support for Iraq, and further expressed condemnation of the United States as their motivation for the bombings.



141.    On May 29, 2001, Wadih El-Hage, a U.S. citizen believed to be Bin Laden's personal secretary, was convicted in the Southern District of New York, along with Mohamed Sadeek Odeh, Mohammed Rashed Daoud Al-'Owali and Khalfan Khamis Mohamed, for participating in the conspiracy to bomb the Untied States Embassies in Nairobi and Dar es Salaam in August of 1998. Bin Laden and other Al Qaeda members were indicted but still remain at large.

### Iraqi Involvement in the September 11th Attacks

### Al Nasiriyah News Article

142.    Iraq knew in advance that Al Qaeda was planning to attack U.S. landmarks and civilians in September 2001 in Washington and New York and supported the planned attacks.

143.    Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with Iraqi intelligence since the early 1980s. As such, he has commented on matters of Iraqi political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah. On September 1, 2001, he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by Saddam Hussein. In addition, Al Nasiriyah contains a military base that is believed to house a chemical weapons storage facility. Iraq had previously denied access to this base to U.N. weapons inspectors. It was visited by Zawahiri as early as 1998 and Al Qaeda terrorists trained there for several years.

144.    On July 21, approximately six weeks before the September 11th attacks, Iraqi columnist Mulhalhal reported that Bin Laden was making plans to "demolish the Pentagon after he destroys the White House."

145.    Mulhalhal's July 21 article further informed that Bin Laden would strike America "on the arm that is already hurting." Upon information and belief, this references a second Iraqi sponsored attack on the World Trade Center. This interpretation is further bolstered by another reference to New York as "[Bin Laden] will curse the memory of Frank Sinatra every time he hears his songs." (e.g. "New York, New York") identifying New York, New York as a target.

146.    Mulhalhal further indicated "The *wings* of a dove and the *bullet* are all but one in the same in the heart of a believer." (Emphasis supplied). This appears to be a reference to the use of commercial aircraft as a weapon. The information was reported in an Iraqi newspaper whose editor-in-chief served as secretary to the late Uday Hussein's Iraqi Syndicate of Journalists. The article expressed Iraqi admiration and support for Bin Laden's plans and its appearance in the newspaper would clearly have to be endorsed by Saddam Hussein himself.

147.    All Iraqi news media were strictly controlled and censored by the government of Saddam Hussein and are under the direct oversight of the late Uday Hussein. Various members of Iraqi intelligence worked at and controlled the context of each and every newspaper published inside Iraq.

148.    The information contained in Mulhalhal's published statements was known prior to the events of September 11th, as was the fact that Mulhalhal had ties to Iraqi intelligence. His actions and words demonstrated foreknowledge of the planned attacks by Bin Laden and indicated support by Iraqi co-conspirators.

149.    Iraq's July 21 public statements also exemplify the Bin Laden pattern of publicly threatening violent strikes against the United States prior to and after committing

43

them.  For example, weeks before the August 1998 Al Qaeda attacks on the U.S.

embassies in Africa, Bin Laden threatened U.S. civilians and shortly thereafter bombed

the embassies in Kenya and Tanzania within minutes of each other, killing 223 civilians.

150.    Additionally, after the suicide boat bombing of the U.S.S. Cole in Yemen

in October 2000, Bin Laden publicly threatened violence against America while wearing

traditional Yemeni clothing including a Yemeni war dagger.  Bin Laden sought media

attention to taunt the United States and to recruit additional Muslim supporters.

## Preparation For September 11th Attacks

151.    According to U.S. and foreign intelligence officials, in the Spring of 2000,

Iraqi Intelligence agents met with September 11th plot hijackers Zaid Samir Jarrah and

Marwan al-Shehhi in Dubai, UAE in order to advance the hijacking of U.S. aircraft to

commit terrorist acts.  Not long after the meeting, al-Shehhi entered the United States on

May 29 and Jarrah entered on June 27 to begin preparations for the attacks.

152.    According to Czech intelligence sources, on June 2, 2000, co-conspirator

and Defendant Mohammad Atta, a pilot and the operational leader of the September 11th

terrorist attacks, traveled to Prague to meet other co-conspirators.  The following day,

Atta arrived at Newark International Airport in the United States.

153.    According to the FBI, from July 2000 through March 2001, Atta, Shehhi,

Hanjour, Jarran and Hamzi traveled to the U.S., where they resided and took pilot courses

to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the Al Qaeda

Iraqi conspiracy to hijack U.S. aircraft to commit terrorist acts.

154.    Upon information and belief, between April 8-11, 2001, Atta left Florida

where he was a flight student, to again meet in Prague with Iraqi Intelligence agent al-Ani.

44

Czech Interior Minister Stanislav Gross confirmed that Atta met with al-Ani in early April 2001 in Prague. Atta returned to Florida and within two weeks opened a Sun Country Bank account with $100,000 sent through a money changer in the UAE. Later in 2001, al-Ani was expelled from the Czech Republic for espionage activities. Other intelligence reports indicate that al-Ani met with another September 11th hijacker, Khalid al Midhar as well. Atta reportedly also met with the Iraqi ambassador to Turkey and former Iraqi Deputy Intelligence director Farour al-Hijazi in Prague sometime in early April, 2001.

155. Italian security sources reported that Iraq made use of its embassy in Rome to foster and cultivate Iraq's partnership with Bin Laden and Al Qaeda. Habib Faris Abdullah al-Mamouri, a general in the Iraqi Secret Service, and a member of Iraq's M-8 Special Operations branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats. Al-Mamouri met with September 11th pilot hijacker Mohammed Atta in Rome, Hamburg, and Prague. Al-Mamouri has not been seen in Rome since July 2001, shortly after he last met with Atta.

156. Al-Mamouri's meeting with Atta was in keeping with his previous duties at Salman Pak. Al-Hijazihad recommended to Saddam Hussein the appointment of al-Mamouri to head the Special Operations Branch at Salman Pak. Al-Mamouri's working relationship with al-Hijazihad had been strengthened when they worked together at Salman Pak to devise a new range of terrorist methods. It is here that the plan of controlling a civilian airplane with full fuel tanks by teams of five using items that can be

easily carried aboard a plane and using the plane as a guided missile was developed by al-Mamouri and al-Hijazi at Salman Pak, sometime before 1995.

157.    At Salman Pak, al-Mamouri was placed in charge of coordinating activities with fundamentalist Islamic movements in Pakistan, Afghanistan, the Persian Gulf Countries and Sudan. This came about after Saddam Hussein had decided to seek links with the Islamic terrorist network after the Gulf War. From 1982 to 1990, al-Mamouri worked for the secret service's Special Operations Branch at Salman Pak. In 1990, he was put in charge of relations with the various Islamic fundamentalist movements. Until 1996, al-Mamouri then traveled to strengthen his relations with various fundamentalist organizations under the auspices of Section M4, the clandestine division of the Mukhabarat. Saddam Hussein, realizing that he could not defeat the U.S in a conflict, decided to resort to terrorism. He then realized that the simplest and most effective way was to resort to Kamikaze terrorism. He gave instructions to the Mukhabarat to establish contacts with those fundamentalist groups, including the Hamburg cell, thereby making Atta a co-optee of the Iraqi Mukhabarat.

158.    Between on or about April 23, 2001 and on or about June 29, 2001, Satam M.A. al-Suqami (Flt. 11), Waleed al Shehri (Flt. 11), Ahmed al Ghamdi (Flt. 175), Majeed Moqued (Flt. 77), Ahmed al Nami (Flt. 93), Hamza al Ghamdi (Flt. 175), Mohald al Shehri (Flt. 175), Wael al Shehri (Flt. 11), Ahmed al Haznawi(Flt. 93), and Fayez Ahmed(Flt. 175), traveled from various points in the world to the United States.

159.    The FBI has reported that Atta visited commercial crop dusting aircraft facilities in Florida in March and August of 2001. In the wake of the September 11th attacks, authorities concluded that Atta was investigating the possibility of spraying

chemical or biological weapons on U.S. civilians. In July and August 2001, on several occasions several other Middle Eastern men also visited the same crop dusting facility.

160.    On July 7, 2001, two members of the Iraqi Mukhabarat, Abu Agab and Abu Wa'el traveled together from Germany to Afghanistan and eventually to Kurdistan. Abu Wa'el trained at Al Qaeda terror camps and became the authority for fundamentalist groups operating in Kurdistan intent on crushing opposition to Saddam Hussein. The Iraqi Mujabarat agent, Abu Wa'el is regarded as the real leader of Arsar al-Islam, a Taliban-style group of radical Islamists with links, including financial, to Osama Bin Laden and Saddam Hussein. Indeed, former Anser al-Islam leader Mallah Krekar, while in detention in Norway, told ABC News that he would bring Abu Wa'el who is in Baghdad to the United States for an interview. Ansar al-Islam reportedly had received more than $600,000 from Bin Laden.

161.    The FBI reported that in furtherance of his participation in the hijacking conspiracy, Zacarias Moussoui purchased flight deck videos for the Boeing 747 on June 20, 2001 and took a three day Boeing 747 simulator course in Minneapolis, Minnesota on August 13-15, 2001. He also purchased two knives in Oklahoma City, Oklahoma on August 3, 2001. Moussaoui received approximately $14,000 from Ramzi Bin al-Shibh on August 1-3, 2001.

162.    U.S. government officials reported that in the summer of 2001, Fayez Banihammad (Flt. 175), Saeed Al Ghamdi (Flt. 93), Hamza Al Ghamdi (Flt. 175), Waleed al Shehri (Flt. 11), Ziad Jarrah (Flt. 93), Satam Al Suqami (Flt. 11), Mohald al-Shehri (Flt. 175), Ahmed al Ghamdi (Flt. 93) and Ahmed al Hanzawi (Flt. 93) each opened a Florida Sun Trust Bank account with a cash deposit. These and other bank

47

accounts were used by the September 11th hijackers for living expenses, travel, pilot training, weapons, and other incidentals and served as places where Al Qaeda operatives could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

163.    On September 9, 2001, Bin Laden and other Al Qaeda members, Omar and other members of the Taliban, carried out their plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years. Al Qaeda terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

164.    This assassination solidified Bin Laden's asylum and protection in Taliban controlled Afghanistan and cleared the way for Al Qaeda's unprecedented attack on the United States two days later. The Taliban would continue to refuse to surrender Bin Laden or Al Qaeda members to the United States after the September 11th attacks.

### The Terrorist Attacks on September 11, 2001

165.    On September 11, 2001, Defendants Mohammed Atta, Abdul Aziz al-Omari, Wa'il al-Shehri, Waleed al-Shehri, and Satam Al Suqami hijacked American Airlines flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the South Tower of the World Trade Center in New York.

166.     On September 11, 2001, Defendants Marwan al-Shehhi, Fayez Ahmed a/k/a/ "Banihamad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohaud al-Shehri hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m. crashed it into the North Tower of the World Trade Center in New York.

167.     On September 11, 2001, Defendants Khalid al-Mihdhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi and Majed Moqed hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 AM, crashed it into the Pentagon.

168.     On September 11, 2001, Defendants Zihad Jarrah, Ahmed al-Haznawu, Saeed al-Ghamdi, and Ahmed al-Nami hijacked American Airlines flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., probably the White House or U.S. Capitol. At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

169.     At approximately 9:50 a.m. the North Tower of the World Trade Center collapsed; at approximately 10:29 a.m. the South Tower of the World Trade Center collapsed. Defendants intentionally caused the deaths of and injuries to thousands of innocent persons, including Plaintiffs' decedent John Patrick O'Neill, Sr.

170.     The hijackings referenced above were the culmination of a conspiracy among defendants to attack the United States and murder United States citizens.

### Aftermath of September 11th

49

171.    On two videotapes made by Al Qaeda in September and October 2001, Bin Laden took credit for the September 11th attacks and stated that the attacks went better than expected.

172.    Saddam Hussein is the only national leader who publicly praised the attacks and said that the United States of America deserved them. Iraq has offered sanctuary to Bin Laden and Taliban leaders. Abu Zeinab al-Quarairy, an Iraqi defector who was an officer in the Mukhabarat and was familiar with its operations, reported that when he learned about the World Trade Center attacks on September 11th, he turned to a friend and said "That's ours."

173.    Upon information and belief, several hundred Al Qaeda members, including Abu Abdul Rahman, fled Afghanistan for Kurdistan in Iraq to try to take control of towns not under the control of Saddam Hussein and Iraq, including Halabja, Tawela, and Biyarah. On September 23, 2001, Kurdish forces ousted Ansar al-Islam from Halabja, but the Islamic fundamentalist group remained in control of Tawela and Biyarah.

174.    Israeli intelligence sources verify that for the past two years, Iraqi Intelligence officers have been shuttling back and forth between Baghdad and Afghanistan. According to the Israelis, one of these Iraqi Intelligence officers, Salah Suleiman, was captured in October 2001 by Pakistani officials near the border between Pakistan and Afghanistan.

175.    The British Government has also identified at least two individuals who are Iraqi Intelligence officers trained in Iraq in the use of terror against the Kurds in Northern Iraq. They are Fowzi Saad al-Obeijdi, a/k/a Abu Zubair and Abu Omer al-

Kurdi, a/k/a Rafid Fatah. Although they are Iraqi Intelligence officers still linked to the former Hussein Iraqi government, they are also Al Qaeda operatives. In its published dossier to show Iraq's links to Osama Bin Laden, the British government added that Iraq had allowed al-Qaeda and Bin Laden to train in Iraq.

176. In March 2002, U.S. and allied forces discovered a laboratory near Khandahar, Afghanistan that was designed to produce weapons-grade anthrax. Upon information and belief, Iraqi Intelligence were supplying technology, materials, and training to develop this facility in coordination with Al Qaeda and the Taliban.

177. Instruction documents on an artillery weapon known as the "Super Gun" were found in Al Qaeda camps when they were captured by U.S. forces in the winter of 2001-2002. Iraq is the only state known to have purchased and assembled the Super Gun, a weapon so large it must be constructed in segments. It has a range of several hundred miles.

178. U.S. Government officials, including the U.S. Defense Secretary, confirm the relationship between Al Qaeda and the Iraqi regime. The Secretary of Defense as recently as March 2003 stated that there is "solid evidence" that senior Al Qaeda operatives have visited Baghdad and that the intelligence on these activities is "current."

## COUNT I
## WRONGFUL DEATH

179. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

180. As a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, John Patrick O'Neill, Sr. was killed by the attack upon and subsequent collapse of the World Trade Center in New York City.

181. Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade Center

182. As a proximate result of these acts, Plaintiffs have suffered injury and loss.

183. For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs.

184. Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

## COUNT II
## ACTION FOR SURVIVAL DAMAGES

185. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

186. Immediately before his death, Decedent John Patrick O'Neill, Sr. suffered extreme bodily pain and suffering as a result of the attack upon and subsequent collapse World Trade Center thereby entitling his Estate to compensatory damages.

187. Defendants are directly and vicariously responsible for the attack upon and subsequent collapse of the World Trade Center because they funded, trained, and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade center.

52

188.    As a proximate result of these acts, Plaintiffs have suffered injury and loss.

189.    For the reasons stated above, Defendants are jointly and severally liable to Decedent's estate.

190.    Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

## COUNT III
## ACTION FOR ECONOMIC DAMAGES

191.    Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

192.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs incurred economic damages through the deprivation of Decedent's income.

193.    Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center.

194.    As a proximate result of these acts, Plaintiffs have suffered injury and loss.

195.    For the reasons stated above, Defendants are jointly and severally liable to the Decedent's Estate.

196.    Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

## COUNT IV
## ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

197.    Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

198.    The act of crashing two airplanes into the twin towers of the World Trade Center in New York, NY with the intent to kill Americans, and which, in fact, did kill American John Patrick O'Neill, Sr. constituted extreme and outrageous conduct on the part of the Defendants.

199.    Plaintiff John Patrick O'Neill Jr. was on his way to visit his father at the World Trade Center at the time the attacks occurred. He was on a New York-bound commuter train from New Jersey, when a fellow passenger told him that a plane had just struck the World Trade Center. Plaintiff John Patrick O'Neill, Jr. reached his father by cell phone at 9:17 A.M., and confirmed that the Center had been attacked and that his father was alive and well. When the commuter train got nearer to Manhattan, John Patrick O'Neill Jr. could see the smoke billowing from the World Trade Center site. John Patrick O'Neill, Jr. arrived at Penn Station, and immediately ran downtown towards the World Trade Center. John Patrick O'Neill, Jr. made it to the vicinity of St. Vincent's hospital from where he watched in horror as the first of the towers collapsed, knowing that his father was probably inside. From there he ran to the police station known as Southern District of Manhattan, First Precinct, which is approximately four blocks away from the Trade Center. From there he witnessed the collapse of the second tower. John Patrick O'Neill, Jr. repeatedly tried to call his father's cell phone number, and could not

54

get through. When he finally did get through, he only reached his father's voicemail. He would have been inside his father's office and become a casualty himself had he taken an earlier train.

200.  Plaintiff Christine Irene O'Neill received a call from John Patrick O'Neill, Sr. at 8:53 A.M., less then ten minutes after the first plane struck. He told her what had occurred and that he was alive and well. She turned on the television and was horrified as she watched the live coverage of the second plane striking and of the subsequent collapses of both towers.

201.  Plaintiff Carol O'Neill is the daughter of the late John Patrick O'Neill, Sr.. She was in her high school class in New Jersey at the time of the attacks on September 11, 2001. When the first plane hit the World Trade Center, classes were interrupted and every student in the school was given access to a television to watch the events unfold. Soon thereafter, she watched the Second plane hit the World Trade Center, and then watched both Towers collapse. She knew that her father was in one of the two Towers, and was fearful for his life.

202.  Plaintiff Dorothy A. O'Neill was the mother of John Patrick O'Neill, Sr. John Patrick O'Neill, Sr. was her only son. She was at her home in New Jersey at the time of the attacks of September 11, 2001. She was watching television when the news interrupted the show she was watching, to show the first plane hit the World Trade Center. She subsequently watched the second plane hit the World Trade Center, and then both Towers collapsing. She knew that her only son was in one of the two Towers, and was fearful for his life.

203.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs suffered extreme emotional distress, including extreme mental anguish and emotional and physical pain and suffering.

204.    Defendants are directly and vicariously responsible for the terrorist hijackers' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center.

205.    As a proximate result of these acts, Plaintiffs have suffered injury and loss.

206.    Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

## COUNT V
## ACTION FOR LOSS OF CONSORTIUM

207.    Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

208.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, Plaintiff Christine Irene O'Neill was deprived of the assistance, society, companionship, and consortium of her husband, John Patrick O'Neill, Sr.  This caused Plaintiff Christine Irene O'Neill to suffer, among other things, extreme mental anguish and emotional and physical pain and suffering.

209.    Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## COUNT VI
## ACTION FOR LOSS OF SOLATIUM

210.   Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

211.   As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill, and were deprived of the assistance, society, and companionship of their father, husband and son, respectively, John Patrick O'Neill, Sr. This loss caused John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill to suffer, among other things, extreme mental anguish and emotional and physical pain and suffering.

212.   For the reasons stated above, and pursuant to 28 U.S.C. §1605, which specifically authorizes a cause of action of solatium in civil actions for money damages resulting from terrorist acts, Defendants are jointly and severally liable to Plaintiffs.

213.   Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

## COUNT VII
## CONSPIRACY

214.   Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

215.   As set forth above, the defendants unlawfully, willfully and knowingly

57

combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs.

216.    As set forth above, the defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror.

217.    As set forth above, Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and – attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme.

218.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs.

219.    As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein.

220.    WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## COUNT VIII
### 18 U.S.C. §2333-TREBLE DAMAGES FOR U.S. NATIONALS

58

221.   Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

222.   As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries of Plaintiff's person, property and business through and by reason of acts of international terrorism.

223.   As set forth above, Defendants provided material support and assistance to Osama bin Laden, Al Qaeda and the September 11, 2001 terrorists, enabling them to carry out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks.

224.   As a result of Defendants' acts in furtherance of international terrorism, Plaintiff suffered damages as set forth herein.

225.   Pursuant to 18 U.S.C. §2333, et. seq., the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

226.   WHEREFORE, Plaintiffs, who are nationals of the United States, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

## COUNT IX



## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962

227. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

228. Non-sovereign Defendants are each "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

229. The Defendant charities, banks, and terrorists are each an "enterprise" within the meaning of RICO, the activities of which affect interstate and foreign commerce.

230. By virtue of the predicate acts described in this Complaint, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, Osama bin Laden and Al Qaeda, along with other non-sovereign Defendants herein, transferred, received, and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(a).

231.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary damages in an amount to be determined at trial.

232.    WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and for treble damages in an amount in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

## COUNT X
## ACTION FOR PUNITIVE DAMAGES

233.    Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

234.    The actions of Defendants, acting in concert to carry out their unlawful objectives, were malicious and willful, wanton and reckless in their disregard of the life of John Patrick O'Neill, Sr. and the other victims of the September 11 terrorist attacks.    Defendants intended to carry out actions that would end the lives of persons at the World Trade Center, including the life of John Patrick O'Neill, Sr.

235.    Defendants Saddam Hussein, the Estate of Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-

61

Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Rcg., Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Squami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, and John Does 1-99 caused the extrajudicial killing of John Patrick O'Neill, Sr.

236.    For the reasons stated above, and pursuant to 28 U.S.C. §1605 note and 28 U.S.C. §1606, which specifically authorizes a cause of action for punitive

damages in civil actions for money damages resulting from terrorist acts,

Defendants are jointly and severally liable to Plaintiffs.

237. Plaintiffs collectively demand that judgment be entered against

Defendants, jointly and severally, in the amount of ONE BILLION DOLLARS

($1,000,000,000.00)

## PRAYER FOR RELIEF

238. Plaintiffs request that the court grant judgment in their favor and

against Defendants on Counts I through X, and grant plaintiffs:

a. Compensatory Damages against Defendants, for each cause of action in

the amount described above, plus economic damages in an amount to be

determined at trial for the Decedent's Estate;

b. Punitive damages against Defendants in the amount of ONE BILLION

DOLLARS ($1,000,000,000.00);

c. Reasonable costs and expenses;

d. Reasonable attorneys' fees; and

e. Such other and further relief that the court may determine to be just and

equitable under the circumstances.

## DEMAND FOR JURY TRIAL

239. A trial by jury against all non-governmental defendants is

demanded.

Respectfully submitted,

Joshua M. Ambush
Law Offices of Joshua M. Ambush, LLC
600 Reisterstown Road
Suite 200 A
Baltimore, MD 21208
Tel: (410) 484-2070
Fax: (410) 484-9330
**D.C. Bar Number**: (MD 27025)

Paul G. Gaston
Law Offices of Paul G. Gaston
1120 19th Street
Suite 750
Washington, D.C. 20036
Tel: (202) 296-5856
Fax: (202) 296-4154
**D.C. Bar Number:** 290833

*Attorneys for the Plaintiffs*

Dated: 8/19/03

64